IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : CRIMINAL NO. 1:17-CR-192 |
| | : |
| v. | : (Judge Conner) |
| | : |
| **LOUIS F. PETROSSI (1),** | : |
| | : |
| **Defendant** | : |

## MEMORANDUM

Defendant Louis F. Petrossi, through appointed counsel, moves for compassionate release and reduction of sentence under 18 U.S.C. § 3582(c)(1)(A)(i). (Doc. 124). Petrossi asks the court to reduce his sentence to time served based on his age and medical condition and his concern that the COVID-19 virus[1] may reach the satellite camp at the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute"), where he is currently incarcerated. The government opposes Petrossi's release. For the reasons that follow, we will deny Petrossi's motion.

**I.   Factual Background & Procedural History**

A federal grand jury returned an indictment in this court on June 21, 2017, charging Petrossi with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 3147(1) (Count 1); investment adviser fraud in violation of 15 U.S.C. §§ 80b-6 and 80b-17 and 18 U.S.C. § 3147(1) (Count 2); and

---

[1] The COVID-19 virus is also known as "severe acute respiratory syndrome coronavirus 2" and "SARS-CoV-2." *Naming the coronavirus disease (COVID-19) and the virus that causes it,* WORLD HEALTH ORG., https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it. We refer to the virus herein as "the COVID-19 virus" and to the disease it causes as "COVID-19."

wire fraud in violation of 18 U.S.C. §§ 1343 and 3147(1) (Count 3).  (See Doc. 1).  The charges stemmed from Petrossi's ownership and operation of two investment funds, Chadwicke Partners LLC and Chadwicke Ventures LLC (together, "Chadwicke").  (See generally id.)  The indictment alleged that, from January 2015 to January 2017, Petrossi engaged in a scheme to defraud investors and potential investors by falsely representing that their money would be used to invest in privately held startup companies when Petrossi instead used the money for personal expenses.  (See id. ¶ 7).  The indictment further alleged that Petrossi disseminated fraudulent statements to investors that overstated both the cost and value of securities held by Chadwicke.  (See id.)

Each count of the indictment included an allegation that Petrossi committed the offense while released under Title 18 for other criminal charges—specifically, charges then pending before Judge Brian M. Cogan in the Eastern District of New York for conspiracy to commit securities fraud and other financial crimes related to a fraudulent scheme involving ForceField Energy, Inc. ("ForceField").  (Id. at 10, 12, 13; see id. ¶¶ 13-14).  According to the indictment in the instant case, the pretrial release agreement in the ForceField case barred Petrossi from any employment directly involving investors.  (See id. ¶ 14).  On May 2, 2017, a jury found Petrossi guilty on all counts in the ForceField case.  See United States v. Petrossi, No. 1:16-CR-234, Doc. 256 (E.D.N.Y. May 2, 2017).

Petrossi proceeded to trial in this case on March 5, 2018.  After four days of evidence, the jury found Petrossi guilty on all three counts.  (Doc. 64 at 1).  The jury also found that Petrossi had committed each of the three offenses in this case

2

while on pretrial release in the ForceField case, triggering a statutory sentencing enhancement under 18 U.S.C. § 3147(1).  (See id. at 2).

Petrossi was sentenced on the ForceField charges on May 24, 2018.  Before imposing sentence, Judge Cogan observed that he found Petrossi's health to be a "major mitigating factor" and that he did not wish to have Petrossi "spend his final years in jail," but also noted that Petrossi's repeat conduct was indicative of a "very fundamental character flaw" and an inherent tendency toward fraud and financially injurious conduct.  Petrossi, No. 1:16-CR-234, Doc. 412, Sent. Tr. 30:1-16, 31:17-32:5, 33:2-11 (E.D.N.Y. May 25, 2018).  Judge Cogan described then-77-year-old Petrossi's health problems as consisting of leukemia, pneumonia, pleural effusions, and a potentially cancerous lung nodule.  Id. at 6:12-23.  After balancing the Section 3553(a) factors, Judge Cogan sentenced Petrossi to 44 months' imprisonment to run concurrently across all counts, id., Doc. 407 at 3 (E.D.N.Y. May 25, 2018), a steep variance from the Guidelines range of 121 to 151 months' imprisonment, see id., Doc. 412, Sent. Tr. 5:9-17.  Judge Cogan further imposed a three-year term of supervised release and entered an $8 million restitution order.  Id., Doc. 407 at 5, 8.

We proceeded to sentencing in this case on October 29, 2018.  After resolving several defense objections and establishing a total loss amount of $5,432,453.08—$1,170,940 attributable to the Chadwicke scheme and $4,261,513.08 attributable to relevant conduct in the ForceField scheme—we arrived at an offense level of 34, a criminal history category of I, and a Guidelines imprisonment range of 151 to 188 months.  (See Sent. Tr. 8:6-9:9, 29:14-22).  We balanced the nature of Petrossi's fraud and the aggravating factor that it occurred while under supervision

3

in the ForceField case, with Petrossi's age and health problems, which we found the Federal Bureau of Prisons ("BOP") was adequately equipped to treat. (Id. at 75:10-76:19). After considering the Section 3553(a) factors, the court varied downward to a sentence of 100 months and three days' imprisonment. (See Doc. 111 at 3). This sentence consists of 100 months on each of Counts 1 and 3, and 60 months on Count 2, to be served concurrently with one another and with the 44-month term imposed in the ForceField case, as well as a sentence of one day on each count, to run consecutively, pursuant to 18 U.S.C. § 3147(1). (Id.) The sentence includes a three-year term of supervised release, run concurrent with the ForceField term, and a $2,265,735.84 restitution order. (Id. at 4, 7). Petrossi appealed to the Third Circuit Court of Appeals, which affirmed his convictions and sentence. See United States v. Petrossi, 796 F. App'x 770 (3d Cir. 2019) (nonprecedential).

Petrossi is currently housed at the satellite camp at FCI Terre Haute, with a projected release date of February 24, 2026. See *Find an Inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (search for BOP Register Number "53259-048") (last visited July 31, 2020). On March 24, 2020, we received a motion from Petrossi's family members asking the court to immediately release him to home confinement given his age and health condition and his family's fear of the COVID-19 virus reaching FCI Terre Haute. (See Doc. 122). Recognizing that only the BOP has authority to release a prisoner to home confinement, see 18 U.S.C. § 3624(c)(2), we construed this request as a motion for sentence reduction and compassionate release under 18 U.S.C. § 3582(c)(1)(A) and appointed the Federal Public Defender to determine whether Petrossi may be eligible for such relief and,

if so, to file an appropriate supplemental motion.  (Doc. 123).  Petrossi thereafter asked the warden at FCI Terre Haute to seek compassionate release on his behalf, and the warden replied that the request had been forwarded to the reduction in sentence coordinator who would provide a response within 30 days.  (Doc. 124 ¶¶ 6-7; see Docs. 124-1, 124-2).

On April 9, 2020, appointed counsel filed the instant supplemental motion for sentence reduction and compassionate release, together with a supporting brief and exhibits.  (Docs. 124, 125).  We ordered an expedited government response and thereafter held the motion in abeyance until the statutory exhaustion period lapsed on April 27, 2020—30 days from the warden's receipt of Petrossi's March 28 request.  United States v. Petrossi, No. 1:17-CR-192, ___ F. Supp. 3d ___, 2020 WL 1865758, at *3-5 (M.D. Pa. Apr. 14, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).  The warden denied Petrossi's request on April 27, thus not allowing 30 days to "lapse" without action, so we stayed Petrossi's motion while he fully exhausted administrative remedies.  (See Doc. 133 at 1-2 & n.1 (collecting cases)).  Petrossi appealed that determination to the Third Circuit Court of Appeals; however, because Petrossi fully exhausted administrative remedies while his appeal was pending, the Third Circuit dismissed the appeal as moot on July 23.  (Docs. 136, 143).  We ordered supplemental briefing on the merits of Petrossi's motion, (Doc. 144), which is now ripe for our review, (see Docs. 125, 127, 130, 145, 146).

**II.   Discussion**

Petrossi asks the court to reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act of 2018, § 603(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239.  Section 3582(c)(1)(A)(i) allows the sentencing court to reduce a term of imprisonment if the court finds, after consideration of the Section 3553(a) factors, that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).

Both the defendant and the Director of the Bureau of Prisons ("BOP") can move for compassionate release under Section 3582(c)(1)(A).  See id. § 3582(c)(1)(A).  But before a defendant can move the court directly, he must either "fully exhaust[] all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or wait for 30 days to lapse from the warden's receipt of a request that the BOP file such a motion.  Id.  While there were questions early in the proceedings about what the 30-day lapse provision means and whether it had been satisfied here, there is no question that Petrossi has now fully exhausted his administrative remedies as contemplated by the first prong of Section 3582(c)(1)(A).  (Doc. 142-1). We may therefore address Petrossi's motion on the merits.

**A.   Extraordinary and Compelling Reasons**

Petrossi contends that his medical condition and resulting vulnerability to serious complications from COVID-19 establish extraordinary and compelling reasons to grant compassionate release.  He asserts that he has a bevy of medical

6

ailments which place him at increased risk of serious illness or even death from COVID-19, and he argues that this risk is amplified in the prison setting.

Congress delegated responsibility for defining "extraordinary and compelling reasons" for compassionate release to the United States Sentencing Commission. See 28 U.S.C. § 994(t). In Application Note 1 to Section 1B1.13 of the United States Sentencing Guidelines, the Commission identifies criteria for determining eligibility for a sentence reduction.[2] See U.S.S.G. § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Eligible circumstances include terminal illness as well as "a serious physical or medical condition" or "deteriorating physical or mental health because of the aging process" if the impairment "substantially diminishes" the ability to provide self-care within a correctional facility and is one from which the defendant "is not expected to recover." Id. at cmt. n.1(A)(i), (A)(ii)(I), (A)(ii)(III). A defendant may also be eligible for an age-based reduction if he is 65 or older, is experiencing "serious deterioration in physical or mental health because of the aging process," and has served the lesser of 10 years or 75 percent of his term of imprisonment. Id. at cmt. n.1(B). The Application Note closes with a catchall, authorizing a reduction when the Director of the BOP identifies in a particular case "an extraordinary or

---

[2] We recognize that this policy statement has not been amended since passage of the First Step Act. See United States v. Kelly, No. 3:13-CR-59, 2020 WL 2104241, at *7 (S.D. Miss. May 1, 2020) (quoting United States v. Perdigao, No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020)). We agree with those courts to observe that Section 1B1.13 still "provides helpful guidance" even if it is no longer controlling. Id. (quoting United States v. Beck, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019)).

compelling reason other than, or in combination with," the above. Id. at cmt. n.1(D).

The BOP has developed its own criteria for reviewing prisoner requests for compassionate release, several of which could apply to Petrossi. The BOP program statement contemplates compassionate release for prisoners with a "debilitated medical condition," which it defines as having "an incurable, progressive illness or . . . a debilitating injury from which [the prisoner] will not recover." FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5050.50: COMPASSIONATE RELEASE/REDUCTION IN SENTENCE: PROCEDURES FOR IMPLEMENTATION OF 18 U.S.C. §§ 3582 AND 4205(G) at 5 (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The BOP will consider seeking compassionate release if a prisoner in this category is "[c]ompletely disabled, meaning the [prisoner] cannot carry on any self-care and is totally confined to a bed or chair; or [c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours."[3] Id.

The BOP program statement identifies separate criteria for "elderly prisoners with medical conditions." See id. at 6. To qualify for compassionate release in this category, a prisoner must be 65 or older; suffer from an age-related chronic or serious medical condition that "substantially diminishes" the ability to function in prison and which conventional treatment is unlikely to substantially

---

[3] The BOP program statement includes another category for terminally ill prisoners, that is, those "who have been diagnosed with a terminal, incurable disease and whose life expectancy is eighteen (18) months or less, and/or has a disease or condition with an end-of-life trajectory under 18 U.S.C. § 3582(d)(1)." Id. at 4. Counsel does not suggest that Petrossi is terminally ill. (See generally Docs. 125, 130, 145).

improve; and have served at least half of their sentence. Id. If these factors are met, the BOP then considers how old the prisoner was when the offense of conviction was committed, whether the prisoner suffered from the medical condition at that time, and whether the condition existed and was known to the court at sentencing. See id.

Of course, neither the Sentencing Commission nor the BOP contemplated a deadly global pandemic when developing these criteria. Fortunately, the Third Circuit Court of Appeals had an early opportunity to provide guidance to district courts facing an inrush of compassionate release motions. In United States v. Raia, 954 F.3d 594 (3d Cir. 2020), the court observed that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison . . . cannot independently justify compassionate release, especially considering BOP's statutory role and its extensive and professional efforts to curtail the virus's spread." Raia, 954 F.3d at 597.[4] Over the past few months, district courts in the pretrial and civil detention contexts likewise have opined that a generalized fear of the virus is not a proper basis for habeas relief or pretrial release. See Ndir v. Doll, No. 1:20-CV-705, ___ F. Supp. 3d ___, 2020 WL 2306761, at *5 (M.D. Pa. May 8, 2020) (Conner, C.J.) (collecting cases in civil immigration detainee context); D.M. v. Barr, No. 20-4031,

---

[4] The Third Circuit in Raia held that motions under Section 3582(c)(1)(A) cannot be brought directly in the court of appeals and that the defendant's failure to exhaust administrative remedies would render remand futile. See Raia, 954 F.3d at 596-97. Anything the court said about the merits of the motion, after its threshold jurisdictional determination, is arguably *dicta*. We are nonetheless persuaded by and agree with the court's observations as to the availability of compassionate release during the COVID-19 pandemic.

2020 WL 1969893, at *5 (D.N.J. Apr. 24, 2020) (same); United States v. Anderson, No. 1:19-CR-239, 2020 WL 1953612, at *4, 5 (M.D. Pa. Apr. 23, 2020) (same in pretrial detention context). In other words, something more is required.

Petrossi asserts that his age, medical condition, and fear of contracting the COVID-19 virus combine to supply the requisite "something more." His counsel reiterates the diagnoses known to and considered by the court at sentencing and indicates that now-80-year-old Petrossi's health has deteriorated while in prison. (See Doc. 125 at 3-4; Doc. 145 at 3). The government concedes that Petrossi has "significant medical conditions." (Doc. 146 at 14). This concession is appropriate: prison medical records list current diagnoses of, *inter alia*, leukemia, overweight, hyperlipidemia, glaucoma, hearing loss, essential (primary) hypertension, chronic rhinitis, pleural effusion, osteoarthritis, enlarged prostate, cardiac murmur, and hematuria. (Doc. 148-1 at 57-58).

Several of these diagnoses are contemplated in recently updated COVID-19 guidance from the Centers from Disease Control and Prevention ("CDC"). The CDC warns that individuals with cancer "are at increased risk" of severe illness from COVID-19, and individuals with hypertension "might be at an increased risk." *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated July 30, 2020). Petrossi is also very close to being considered obese—his body mass index is listed at 29.6, (see Doc. 148-1 at 57)—and the CDC advises that anyone with a body mass index of 30 or higher is at increased risk from COVID-19.

See *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

Petrossi plainly qualifies as someone who is uniquely vulnerable to COVID-19. But Raia suggests that this increased risk, without any likelihood of direct exposure to the virus, may not be enough. Like Petrossi, Francis Raia was elderly and had several medical conditions (specifically, type 2 diabetes mellitus and heart issues) appearing on the CDC's increased-risk list. See Raia, 954 F.3d at 596. The Third Circuit acknowledged "the risks that COVID-19 poses in the federal prison system, *particularly for inmates like Raia*," but nonetheless concluded that the "possibility" of the virus reaching Raia's institution could not itself justify compassionate release. Id. at 597 (emphasis added).

We are presented with a similar situation here. As of this writing, the risk of exposure to the COVID-19 virus at Petrossi's institution appears to be minimal. The BOP is not reporting any positive cases among prisoners or staff at the satellite

camp at FCI Terre Haute.[5]  See *COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (select "Full breakdown and additional details") (last updated Aug. 3, 2020, 3:00 p.m.); (Doc. 145 at 4; Doc. 146 at 2).  And the BOP has undertaken extensive efforts to keep the virus out of its facilities and to reduce spread within facilities the virus has reached.  Nationwide, the BOP has suspended most visitation, implemented screening measures for staff and prisoners, and limited contractor visits to essential services.  See *BOP Implementing Modified Operations*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Aug. 3, 2020).  Prisoner movement between BOP facilities has been "suspended with limited exceptions."  Id.  Movement within facilities is restricted as well, with exceptions only for mental health and medical treatment; certain programs and services; and access to commissary, laundry, showers, and telephones.  See id.  We therefore have no objective basis to find that Petrossi is at imminent risk of being exposed to or contracting the COVID-19 virus.

---

[5] The federal correction complex located in Terre Haute, Indiana, is home to both a United States Penitentiary ("USP Terre Haute") and FCI Terre Haute. See *Our Locations*, FED. BUREAU OF PRISONS, https://www.bop.gov/locations/list.jsp (select "Terre Haute FCC") (last visited Aug. 3, 2020).  The latter actually consists of two separate facilities: a medium-security federal correctional institution and an adjacent minimum-security satellite camp.  See *FCI Terre Haute*, FED. BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/tha/ (last visited Aug. 3, 2020). Although there have been positive tests among prisoners and staff and one prisoner death at the nearby USP Terre Haute and the medium-security prison, see *COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (select "Full breakdown and additional details") (last updated Aug. 3, 2020, 3:00 p.m.), the parties confirm that there have been no positive cases at the satellite camp, (see Doc. 145 at 4; Doc. 146 at 2).

The BOP has also ramped up exercise of its authority under 18 U.S.C. § 3624(c)(2)—recently expanded by the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020)—to release certain vulnerable prisoners to home confinement, and has released 7,247 prisoners to date. *COVID-19 Coronavirus,* FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/. The government reports that the BOP does not consider Petrossi's medical condition to be serious enough to necessitate release to home confinement. (Doc. 127 at 6 n.2). In denying Petrossi's request for compassionate release, the warden noted that Petrossi's leukemia is controlled with medication and added that Petrossi has occasionally been a difficult patient, aggravating future occurrences of pleural effusions and hampering the ability to control his blood pressure by refusing to take prescribed medication. (See Doc. 131-2 at 1-2). That professionals familiar with Petrossi's condition do not believe it to be as dire as depicted by counsel further informs our own conclusion that Petrossi has not demonstrated an extraordinary and compelling basis for release.

We also have no reason to believe that the BOP cannot or will not adequately treat Petrossi going forward. Nearly 170 pages of medical records establish that the BOP is actively monitoring Petrossi's health and treating his medical conditions. Even with current pandemic-related restrictions, Petrossi is seen often by medical staff. (See generally Docs. 148, 148-1). Petrossi's claim that "he has not had a face-to-face meeting with a medical doctor for more than four months" is refuted by the medical records, which reveal that Petrossi was seen by a doctor, in person, on May 4, (id. at 4), and that he had multiple in-person visits with a registered nurse and

certified nurse practitioner throughout the past four months, (see id. at 1 (June 8); id. at 9 (April 20); id. at 14 (April 16); id. at 20 (March 26)). As recently as June 8, Petrossi denied medical complaints or needing medical attention and reported to medical staff that he was "doing well." (Id. at 1). These records confirm what we observed at sentencing: the BOP is well equipped to meet Petrossi's medical needs. (Sent. Tr. 76:9-19). On these facts, we cannot conclude that the possibility that the COVID-19 virus *might* reach the satellite camp at FCI Terre Haute is an "extraordinary and compelling" reason for release.[6]

---

[6] Petrossi cites our colleague's decision in United States v. Foster, No. 1:14-CR-324, Doc. 191 (M.D. Pa. Apr. 3, 2020) (Jones, J.), which granted compassionate release to a 70-year old defendant with a chronic lung condition based on the risk of the COVID-19 virus reaching his institution. The Foster decision was issued the same morning that the Raia opinion was docketed and thus does not account for the Third Circuit's observations. In addition, Foster is factually distinct. The defendant was nearing the last year of his 5-year sentence, and the BOP had already set a date of May 18, 2020, for release to home confinement as part of its COVID-19 priority placement review. See Foster, No. 1:14-CR-324, Doc. 191 at 2. The court simply used its authority under Section 3582(c)(1)(A)(i) to accelerate the defendant's release date by 45 days. Id. at 11. Thus, Foster is distinguishable.

**B.    Section 3553(a) Factors**

Even if we were to find that Petrossi is eligible for compassionate release, our analysis must still be informed by the Section 3553(a) factors,[7] and any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A); see also United States v. Pawlowski, No. 20-2033, ___ F.3d ___, 2020 WL 4281503, at *2 & n.6 (3d Cir. June 26, 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)).  It is our considered view that the Section 3553(a) factors do not support a reduction of Petrossi's sentence.

Accounting for good time, Petrossi has nearly 67 months remaining on his sentence.  See Pawlowski, 2020 WL 4281503, at *2 (holding that time remaining on sentence is one factor courts may consider in compassionate-release analysis).  Importantly, this court's existing 100-month and three-day sentence already reflects a nearly 33% variance below the bottom of the Guidelines range.  Two of the most significant factors justifying this large variance were Petrossi's age and medical condition.  (See Doc. 118 at 3).  We found at the time of sentencing, and reaffirm now, that the sentence imposed on Petrossi reflects an appropriate balancing of

---

[7] The Section 3553(a) factors are (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available"; (4) the kinds of sentence and sentencing range recommended by the United States Sentencing Guidelines; (5) pertinent policy statements issued by the United States Sentencing Commission; (6) "the need to avoid unwarranted sentencing disparities" among similarly situated defendants; and (7) the need for restitution.  18 U.S.C. § 3553(a).

mitigating personal circumstances with the aggravating nature of the offense conduct. (See Sent. Tr. 75:77:25). We reiterate that Petrossi inflicted serious financial harm on multiple victims for a total loss of more than $5 million, and he committed these crimes while on pretrial release for similar conduct in the Eastern District of New York. (See id. at 75:19-24, 77:1-11). As we underscored at sentencing, this latter consideration is the primary reason that the sentence in this case is more than double the sentence in the New York case. (See id. at 77:1-6).

Petrossi's additional entreaties—that he is a nonviolent offender, that he is less likely to reoffend due to his age and health, and that concerns as to recidivism should be quelled by the prohibition on future employment involving securities— are not persuasive. (See Doc. 125 at 14; Doc. 130 at 12). The nonviolent nature of Petrossi's offenses was considered by the court in varying below the Guidelines range, as were his age and medical condition. (See Sent. Tr. 76:9-22). Petrossi committed his offenses in this case and in the New York case while in his mid-70s and receiving cancer treatment, so his age and poor health do not weigh as heavily against our recidivism concerns as they otherwise might. (See id. at 77:15-25). And Petrossi committed his offense in this case while subject to a pretrial ban on financial employment imposed by the Eastern District of New York, so we are not convinced that a similar ban contained in this court's judgment renders his likelihood of recidivism "non-existent." (Doc. 125 at 14). We conclude that the Section 3553(a) factors militate in favor of leaving Petrossi's existing sentence intact.

**III.     Conclusion**

We are not unsympathetic to Petrossi's concern—or to any medically vulnerable prisoner's concern—that the COVID-19 virus may reach the federal correctional facility where he is housed.  But that concern does not alone supply an "extraordinary and compelling" reason to reduce Petrossi's 100-month sentence by more than half.  Nor does it counterbalance the aggravating Section 3553(a) factors revisited *supra* or the fact that Petrossi's sentence already reflects a significant downward variance.

We will thus decline to exercise our discretion to reduce Petrossi's sentence at this time.  Mindful of the rapidly evolving nature of the COVID-19 pandemic and the potential for hotspot outbreaks, our denial will be without prejudice to Petrossi's ability to refile the motion if his circumstances or the circumstances at the satellite camp at FCI Terre Haute materially change.  An appropriate order shall issue.

       /S/ CHRISTOPHER C. CONNER
       Christopher C. Conner
       United States District Judge
       Middle District of Pennsylvania

Dated:     August 4, 2020